IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                    No. 05-20433-B

CORNELIUS SHIELDS,
TRAVORIS KEY,

    Defendants.
_____

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS TO SUPPRESS**
_____

        Before the Court are the motions of the Defendants, Cornelius Shields and Travoris Key, to suppress evidence. These Defendants were charged in a four-count indictment; in Count 1 with conspiracy to possess with intent to distribute and distribution in excess of fifty grams of cocaine base, cocaine and marijuana in violation of 21 U.S.C. § 846 and in Counts 2, 3 and 4 with aiding and abetting in possessing with intent to distribute fifty grams of cocaine base, aiding and abetting in the possession with intent to distribute cocaine, and aiding and abetting in the possession with intent to distribute marijuana, respectively, all in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

        The Defendants moved to suppress evidence seized by officers of the Fayette County Sheriff's Department, who were serving an arrest warrant on November 13, 2005 at a residence at 90 Alamo Cove near Rossville, Tennessee. At the time of the incident, the Defendants were seated in an SUV (sport-utility vehicle) located on the subject property when sheriff's deputies arrived to serve an arrest warrant on an individual named Eric Polk. Both Defendants contend that the officers violated their rights under the Fourth Amendment of the United States Constitution because they were detained and subjected to a search without probable cause or reasonable suspicion of criminal activity. As the contraband seized from these Defendants and from inside the vehicle was discovered as a result of this illegal search, they contend that the fruits of the search should be

suppressed.

Initially, the Government challenged the Defendants' standing to raise the constitutional issue as to the search of the SUV. The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "Capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." United States v. Gooch, ___ F.3d ___, 2007 WL 2372256, at *3 (6th Cir. Aug. 21, 2007) (citing Rakas v. Illinois, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)). In order to determine the existence of a legitimate expectation of privacy in the SUV, the Court must first "ask whether the individual, by conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private ... Second, [the Court is to] inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." United States v. Waller, 426 F.3d 838, 844 (6th Cir. 2005) (citing United States v. King, 227 F.3d 732, 743 (6th Cir. 2000)). The existence of a legitimate expectation of privacy in a particular place or thing is determined on a case-by-case basis. Id.

A hearing was conducted on the motions and the Defendants' right to contest the search of the vehicle. Inasmuch as the burden of establishing their standing to assert a Fourth Amendment violation rested with the Defendants, see United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001), each took the stand to testify as to what privacy rights they were asserting. Shields asserted that, at the time of the arrest, he was seated in the driver's seat of the vehicle for approximately five to ten minutes before the officers arrived. He did not own or rent the vehicle. Nor did he try to start it, although the keys were already in the ignition. He had been on the property for approximately an hour before the officers arrived. Apparently, the vehicle, an SUV, had been leased by his brother, Wendell Shields. There was no proof that this Defendant had been given permission by his brother to either operate the SUV or even sit in it.

Key, seated on the passenger side, testified that he had lived with his mother for approximately sixteen years at the residence where the car was parked. He averred that he and Shields entered the car because it started raining. Neither knew whether the car was operable. There was also no evidence that Key had been given permission to operate or sit in the vehicle by Wendell Shields.

Based upon this testimony, the Court determined that neither Shields nor Key had a legitimate expectation of privacy to challenge the search of the vehicle. There was no actual, subjective expectation of privacy by either of the Defendants in their explanation of how they came to be inside the vehicle and certainly no objective reasonable expectation of privacy was established by either. As noted in their testimony, the two Defendants entered the SUV where the keys were already in the ignition without any permission by the person who had rented the vehicle. Inasmuch as Shields and Key lacked any type of possessory interest in the automobile and provided no evidence that they had been given permission to even occupy the car, there is simply no legitimate expectation of privacy for either Defendant in this vehicle based on the totality of the circumstances. See United States v. Smith, 263 F.3d 571, 581-87 (6th Cir. 2001) (discussing application of legitimate expectation of privacy jurisprudence to rental vehicles and acknowledging as a "general rule, an unauthorized driver of a rental vehicle does not have a legitimate expectation of privacy in the vehicle . . ."); see also United States v. Frederickson, No. 90-5536, 1990 WL 159411, at *2-3 (6th Cir. Oct. 22, 1990) (defendant who was either a passenger in or an unauthorized driver of rental van had failed to show a legitimate expectation of privacy in the vehicle). Therefore, the Court finds the Defendants lack standing to contest the search of the vehicle by the investigating officers. The motions to suppress as to items found in the SUV are, therefore, DENIED.

Turning to the question in the Defendants' motions concerning their detention and the search of their persons under the Fourth Amendment, the Court will review the relevant evidence presented at the hearing. The only witness offered by the Government was John Carter, an investigator with the Fayette County Sheriff's Department. Carter normally was in charge of investigating drug cases

for the department, but, on the evening of the Defendants' arrests, he assisted fellow officers in serving warrants and performing a "saturation" of the neighborhood based on residents' complaints.

On November 13, 2005, there were five vehicles serving warrants, one of which was for the arrest of Polk, who lived at the 90 Alamo Cove residence. Carter was the first to arrive at the residence around 11:00 p.m. and, upon exiting his unmarked vehicle and running toward the house, saw the SUV on the premises with two people inside. The officer stated that it was not raining to his knowledge and that he "never got rained on" that night. He trained his flashlight toward the SUV and alerted other officers, one of whom remained at the vehicle. After the other officers neared the residence, Carter returned to the SUV and stood at the driver's side door. He pointed his flashlight downward through the lightly-tinted window toward the laps of the Defendants and saw what appeared to him to be prescription bottles between their thighs. He testified that he could read on the bottle by Shield's leg what he denoted to be a female's name, but could not recall what the name was. He also observed on Shields' left leg what looked to be two approximately inch long marijuana stems as well as some white flecks, that in his experience could have been cocaine. The vehicle's domelight was off and it was dark inside. In response to Carter's request that he roll down the window, Shields initially opened it a couple of inches. The Defendant fully opened the window only after repeated instructions to do so by the officer. Carter claimed that, as soon as Shields cracked the window, he could smell the strong, obvious odor of marijuana emanating from the vehicle's interior. Carter asked Shields for his identification and, after observing the Defendant looking away from him and placing his hand downward several times, instructed him to exit the SUV.

Carter then patted Shields down for weapons for officer safety and, in doing so, felt the Defendant's pockets and identified cellophane bags containing what he believed to be drug stems and seeds. He also felt what appeared to be cash. Specifically, Carter testified that "[o]n pat-down, in one of his pockets there was like a large, what had felt like it was either paper or money. And in also in the pocket was a felt like a cellophane bag. It had stems, kind of mushy. I could also feel some seeds in there when I manipulated it." The items were taken from Defendant and, as a result,

4

Shields was placed in handcuffs.

Carter then walked around to the passenger side, where another deputy was talking with Key. According to Carter, Key kept placing his hand out of sight toward his pocket and ignoring instructions to keep his hands visible. He too was asked to exit the vehicle and patted down. The officer recalled that, upon patting this Defendant down for weapons, "[t]here was a large sum of money in one pocket, turned out to what was a large sum of money in one pocket. And another pocket there was a cellophane bag that had a large, one very large rock substance, and then in another part of the bag he had several rock substances of different sizes in it." Key was also detained and placed in the police car along with Shields. Following these arrests, officers conducted a search of the vehicle, which revealed scales under the seat and large amounts of cocaine and crack cocaine under the cup holders in the console. Polk was located inside the residence and placed under arrest.

On cross-examination, the officer admitted that the stems seen on Shields' pant legs were not recovered because, based on his training, marijuana stems and seeds do not contain THC[1]. The two bottles of what Carter described as prescription medication were later found to contain Tussinex, a cough syrup containing codeine. The witness reiterated that the reason for the patdown of the Defendants, which occurred before either was handcuffed, was to determine whether they had weapons. The officer noted that there was no resistance by the Defendants at the scene and no firearms were found. Carter testified that in feeling Key's pockets he could detect the presence of cellophane with what he described as "rocks" inside and, based on his experience as a drug officer, concluded that the rocks were crack cocaine. He acknowledged that he found no rolling papers, roach clips, marijuana that appeared to have been smoked, or other evidence showing that Defendants had been smoking in the vehicle. While there was a blunt[2] box located in the car, it

---

[1] Tetrahydrocannabinol ("THC") is the primary psychoactive substance found in the cannabis, or marijuana, plant. United States v. Caseer, 399 F.3d 828, 848 (6th Cir. 2005).

[2] A "blunt" is a type of cigar. The term is also used in street slang to refer to a cigar that has had its tobacco filling removed and replaced with marijuana or other smoking herbs. United States

5

was empty and there were no blunts observed outside the SUV. Nor did the vehicle search reveal paraphernalia associated with the use of cocaine or crack cocaine, such as straws, needles, boards or razor blades.

The only witness for the Defendants was Annie Avant, who claimed she had lived at 90 Alamo Cove for approximately twenty five years. Besides Defendant Key, Polk, Key's son and her granddaughter also lived at the residence. Avant claimed that, on the night of the arrest, she was looking out the front door when the officers arrived at approximately 10:30 to 11:00 p.m. There were no lights on around the house. She described the weather as a little cold along with some light rain. She recalled that Polk came out of the house and was handcuffed, but at that point Key was still sitting in the SUV with the door closed and the window down. The witness estimated approximately two minutes elapsed between the time the police arrived and Polk was handcuffed. Avant did not remember seeing a police officer standing at the passenger side of the vehicle when Polk was taken away and could not see what was occurring on the driver's side of the SUV where Investigator Carter was interacting with Shields.

The Fourth Amendment guarantees that the "right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . ." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions.'" United States v. Hudson, 405 F.3d 425, 441 (6th Cir. 2005) (quoting Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)). An arrest and search absent a warrant "is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." Logsdon v. Hains, 492 F.3d 334, 341 (6th Cir. 2007) (quoting Devenpeck v. Alford, 543 U.S. 146, 152, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004)). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." Id. (quoting Henry v. United States, 361 U.S. 98,

---

v. Robinson, 146 F.App'x 255, 258 (10th Cir. 2005).

102, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959)).

The Government asserts that probable cause to arrest the Defendants and, therefore, to search their persons, existed at the time Carter detected the marijuana smell coming out of the window and when he observed the prescription bottle bearing the name of another. However, the Court finds that Carter's testimony with respect to the marijuana smell and the identification on the prescription bottle in Shields' lap is not credible. It is uncontroverted that there was no objective evidence, such as rolling papers, roach clips or blunts, to indicate that Defendants had been smoking marijuana in the vehicle. Nor was there any evidence presented at the hearing to suggest that a small amount of marijuana in a sandwich bag hidden in a pants pocket, or a few small stems and seeds, would exude sufficient odor to cause the "quick gush" of the smell described by the officer to emanate from the two-inch crack in the window. See United States v. Mercadel, 75 F.App'x 983 at *5 (5th Cir. July 1, 2003) (failure of police to find any evidence of recently smoked marijuana supported court's conclusion that officer's testimony that he smelled marijuana was not credible).

The officer's statement that he could see a woman's name on the prescription bottle located inside the vehicle is also suspect. Carter testified that he is six feet three inches tall and was standing at the driver's side door post, in the vicinity of the door handle, and not stooping when he observed the bottle in the light of his flashlight through the window. He recalled that he could only read the name of the person to whom the contents had been prescribed, because it was in larger print than the other writing on the bottle. He did not remember the woman's name. The officer testified that he was uncertain whether the prescription label was above the height of Shields' thighs, but that it was "just laid back in a -- against the crotch area there towards the right leg. He insisted he could see the label plainly.[3] In reviewing a photograph of the items taken from the Defendants provided as an exhibit at the hearing, the Court simply finds the officer's testimony questionable. The

---

[3]Neither prescription bottle was presented at the hearing for the Court's inspection of the labels or the size of the print thereon. Additionally, there was no further indication by the officer as to whether these bottles were legally in the possession of the Defendants. Indeed, there is no evidence to suggest that any investigation whatsoever was made with respect to the bottles after the driver's side window was opened.

photograph, which appears to have been taken in fluorescent light with a flash by an individual in a standing position, shows the bottles on a table from approximately two to three feet away. At this distance, even under good lighting conditions, none of the printing on the prescription bottles is remotely discernable.[4]

Therefore, the Government is left with the officer's observation of two inch long stems and flecks of a white substance of Shields' pants leg to establish probable cause to arrest and search the Defendants, which, given its somewhat half-hearted argument, seems to concede is not sufficient. See United States v. Harris, 6 F.App'x 304, 307 (6th Cir. 2001) (suggesting that the presence of a single marijuana stem in defendant's trash can on its own was probably insufficient to establish probable cause). In support of its position, the Government cites to United States v. Briscoe, 317 F.3d 906, 908-09 (8th Cir. 2003), in which the Eighth Circuit held that marijuana stems and seeds are independently adequate to establish probable cause. It is perhaps worth noting here that officers found forty marijuana seeds and twenty-five marijuana stems that tested positive for THC in Briscoe's garbage, far more than the two small unrecovered twigs observed on Shields' pants. See Briscoe, 317 F.3d at 907. While Briscoe has not been cited by the Sixth Circuit, it has been referred to in various district court decisions from this circuit. See United States v. MacFarlane, No. 03-81083, 2007 WL 128934, at *4 (E.D. Mich. Jan. 12, 2007) (*repeated* discovery of stems and seeds in defendant's trash can sufficient to establish probable cause); United States v. Wade, No. 1:06-cr-21, 2006 WL 2583271, at *2-5 (W.D. Mich. Sept. 7, 2006) ("loose" marijuana in trash, coupled with tip, sufficient to establish probable cause for issuance of search warrant); United States v. Velasquez, No. 1:05CR0558, 2006 WL 1878892, at *3, 6-8 (N.D. Ohio July 6, 2006) (corner-ripped plastic bags used as drug-packing materials and plastic bag containing cocaine residue sufficient alone to establish probable cause for search warrant, although officer had also been told of drug activity at the residence; court, calling case before it a "close call," noted that Harris and Briscoe

---

[4]Although not dispositive, the Court further credits the testimony of Keys and Avant that it was raining at the time of the search, if for no other reason but that they, as opposed to Carter, would likely not appreciate the significance of that detail on the outcome of the instant motion.

"present different factual scenarios and likely appear at the outer ends of the trash-pull evidence spectrum"); United States v. Hampton, No. 1:05-CR-166, 2005 WL 3555507, at *4-5 (W.D. Mich. Dec. 27, 2005) (officer's observation of marijuana residue in plain view in vehicle console sufficient to justify search; officer had also smelled marijuana burning and had information that the occupants of residence were smoking marijuana); United States v. Scott, No. 1:05 CR 173, 2005 WL 2436455, at *3 (W.D. Mich. Oct 3, 2005) (although not disputing Sixth Circuit's statement in Harris, observation of one marijuana stem sufficient to establish probable cause to search where officers also found Ziploc bags and cellophane wrap containing marijuana residue). In this case, based on the totality of the circumstances, the Court finds the twigs and flecks that, according to Carter's testimony, could have been marijuana and cocaine are not sufficient to establish probable cause to arrest, and concomitantly to search, the Defendants.

The Government also posits, however, that even if probable cause did not exist, the patdowns passed constitutional muster as made in connection with a Terry stop. While an arrest must be supported by probable cause, police officers are permitted to make a reasonable investigatory stop, in the absence of probable cause, as set forth by the Supreme Court in Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). "A police officer may conduct an investigatory search and seizure so long as the officer is able to point to specific and articulable facts which give rise to a reasonable suspicion of criminal activity." United States v. Long, 464 F.3d 569, 572-73 (6th Cir. 2006), cert. denied, ___ U.S. ___, 127 S. Ct. 1339, 167 L. Ed. 2d 135 (U.S. Feb. 20, 2007) (No. 06-8863) (citations and internal quotation marks omitted). The brief stop of a suspicious person to make reasonable inquiries aimed at confirming or dispelling the officer's suspicions is permissible. United States v. Butler, 223 F.3d 368, 374 (6th Cir. 2000). A Terry stop may reasonably include an instruction to exit a vehicle. See Hudson, 405 F.3d at 431. It may also entail asking for identification. United States v. Atchley, 474 F.3d 840, 848 (6th Cir.), cert. denied, ___ U.S. ___, 127 S. Ct. 2447, 167 L. Ed. 2d 1145 (U.S. May 21, 2007) (No. 06-10770). "[R]eviewing courts must look at the totality of the circumstances of each case to see whether the detaining officer has a

particularized and objective basis for suspecting legal wrongdoing." United States v. Garrido, 467 F.3d 971, 981 (6th Cir. 2006) (quoting United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002)) (internal quotation marks omitted). The Government bears the burden of justifying a warrantless search. United States v. Haynes, 301 F.3d 669, 677 (6th Cir. 2002). The Court finds that officers had a reasonable suspicion that criminal activity was afoot to conduct a Terry investigation based on the observation of prescription bottles and what appeared to be marijuana stems and white flecks.

Under Terry, an officer may conduct a patdown search or frisk for weapons if he has a reasonable suspicion to believe that he was dealing with a possibly armed and dangerous suspect. Michigan v. Summers, 452 U.S. 692, 698, 101 S. Ct. 2587, 2592, 69 L. Ed. 2d 340 (1981); United States v. Vite-Espinoza, 342 F.3d 462, 466 (6th Cir. 2003), reh'g & suggestion for reh'g en banc denied (Nov. 21, 2003). As the Supreme Court recognized in Minnesota v. Dickerson, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993),

> [t]he purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. Rather, a protective search--permitted without a warrant and on the basis of reasonable suspicion less than probable cause--must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby. If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed.

Dickerson, 508 U.S. at 373, 113 S. Ct. at 2136 (internal citations and quotation marks omitted). In Dickerson, the Supreme Court permitted the seizure of contraband in a Terry search, articulating that

> [i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.[5]

Id. at 375-76, 113 S. Ct. at 2137. The facts of Dickerson, and the application of the "plain feel

---

[5] Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." Dickerson, 508 U.S. at 375, 113 S. Ct. at 2136-37 (citing Horton v. California, 496 U.S. 128, 136-37, 110 S. Ct. 2301, 2307-08, 110 L. Ed. 2d 112 (1990)).

doctrine" to those facts, are of particular import to the case at bar. In Dickerson,

> [t]he officers pulled their squad car into the alley and ordered respondent to stop and submit to a patdown search. The search revealed no weapons, but the officer conducting the search did take an interest in a small lump in respondent's nylon jacket. The officer later testified: "[A]s I pat-searched the front of his body, I felt a lump, a small lump, in the front pocket. I examined it with my fingers and it slid and it felt to be a lump of crack cocaine in cellophane." The officer then reached into respondent's pocket and retrieved a small plastic bag containing one fifth of one gram of crack cocaine.

Id. at 369, 113 S. Ct. at 2133. On those facts, the Supreme Court found that

> the officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to the sole justification of the search under Terry and the protection of the police officer and others nearby. It therefore amounted to the sort of evidentiary search that Terry expressly refused to authorize and that [the Court has] condemned in subsequent cases.

Id. at 378, 113 S. Ct. at 2138-39 (internal citations and quotation marks omitted). The question to be answered by the Court at this juncture is whether the search of the Defendants' pockets went beyond what is permissible in light of Dickerson. The Court finds in the affirmative.

As the Court has already pointed out, Carter recalled at the hearing that he ascertained the presence of marijuana seeds in Shields' pocket upon "manipulating" it. Further, Carter acknowledged that, when he patted Key down, he didn't feel anything he thought was a weapon. He testified as follows:

> Q: And in fact, from patting him down, you didn't know other than knowing that he did not have a hard object shaped like a revolver or a knife, you didn't know what was in his pockets?
>
> A: I had a feeling from the patdown that the package wrapped in cellophane or what felt like cellophane and from the shape of it that there was a high probability that it was cocaine, crack cocaine.
>
> Q: You had a feeling, and your feeling through his pockets, you said he was wearing running shorts, running shorts with pockets in the front?
>
> A: No, ma'am, wasn't running shorts. He had on like a pair of -- if I recall, which I said I wasn't positive, but I felt like it was a pair of jogging pants. It was like the wind suit material, if I remember correctly.
>
> Q: And it is your testimony that these had pockets?
>
> A: Yes, ma'am.

11

> Q: How many pockets?
>
> A: I know it had two front pockets.
>
> Q: How about back pockets?
>
> A: I don't recall.
>
> Q: And through the layers of this material, you were able to discern that what you were feeling was cellophane?
>
> A: I could hear it and I could feel the crinkling between my fingers and also feel the rocks underneath it.
>
> Q: What kind of cellophane was it? What was it, the thickness millimeters of thickness of it?
>
> A: I have no idea.
>
> Q: Was it common kitchen cellophane?
>
> A: Like a sandwich baggie.
>
> Q: Zip-Loc or fold-over?
>
> A: Fold-over like you put a sandwich in and fold the top over.

It is the conclusion of the Court upon review of the testimony that the identity of the objects in the Defendants' pockets was not "immediately apparent" as contraband. Rather, only upon continued manipulation of the pockets between his fingers did Carter conclude that they contained drugs. See pp. 4-5 of this Order. It is the Court's conclusion therefore that the search of the Defendants' pockets exceeded the bounds of the Fourth Amendment.

The Government submits, however, that, even if the patdown was unlawful, the contents of the Defendants' pockets would have been inevitably discovered after a search of the car based on probable cause arising from the marijuana odor and the observation of residue.

> The Fourth Amendment does not contain a provision that prohibits the use of evidence obtained in violation of its commands. But the judicially crafted exclusionary rule mandates suppression of evidence obtained from a constitutional violation. The inevitable discovery doctrine is an exception to the exclusionary rule which allows unlawfully obtained evidence to be admitted at trial if the government can show that the evidence inevitably would have been acquired through lawful means. The doctrine applies whenever there are compelling facts establishing that the disputed evidence inevitably would have been discovered.

United States v. Garcia, 496 F.3d 495, 505-06 (6th Cir. 2007) (citing United States v. Kennedy, 61 F.3d 494, 497, 499 (6th Cir. 1995)) (internal citations and quotation marks omitted). [T]he inevitable discovery exception to the exclusionary rule applies when . . . evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first." United States v. Keszthelyi, 308 F.3d 557, 574 (6th Cir. 2002), reh'g & suggestion for reh'g en banc denied (Dec. 19, 2002). "The exception requires the court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." United States v. Kimes, 246 F.3d 800, 804 (6th Cir. 2001), cert. denied, 534 U.S. 1085, 122 S. Ct. 823, 151 L. Ed. 2d 705 (2002) (citation omitted). In this case, as previously stated herein, the Court does not credit the officer's testimony that he smelled marijuana and has determined that the presence of two small stems and white flecks was not sufficient to establish probable cause. See Harris, 6 F.App'x at 307, supra. The facts adduced at the hearing show that, absent the illegal search of the persons of the Defendants and their resulting arrest, there would have been no probable cause to search the SUV. See Atchley, 474 F.3d at 849 n.4 (citing Chimel v. California, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969)) (search of area within arrestee's immediate control permissible under Fourth Amendment). Therefore, under the facts before the Court, the Government has not shown, and indeed cannot, that there was a lawful basis for the vehicle search. The subsequent search of the SUV resulted from the "exploitation of information obtained through an illegal arrest." United States v. Eylicio-Montoya, 70 F.3d 1158, 1167 (10th Cir. 1995). Accordingly, the inevitable discovery doctrine does not apply.[6] Because the search of the Defendants' persons was in violation of the Fourth Amendment and the Government has failed to carry its burden of establishing application of the inevitable discovery doctrine, the motions to suppress the evidence seized from

---

[6]The Court's analysis is the same regardless of whether the Defendants had standing to challenge the search of the vehicle. See Eylicio-Montoya, 70 F.3d at 1165-67 (in order for inevitable discovery rule to apply, government bears burden of showing that the evidence at issue would have been discovered in the absence of a Fourth Amendment violation, even where defendant did not have standing to challenge the vehicle search).

the pockets of Shields and Key are GRANTED.

      IT IS SO ORDERED this 18th day of December, 2007.

                              s/ J. DANIEL BREEN
                              UNITED STATES DISTRICT JUDGE